# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

Civil Action No.


HAWA ABDULLE,
AHMED AYBAKAR,
KELVIN CAGA,
BRUCE MIZERO,
VICTORIA YEBOAH, and
KENHINDE YUSUF,

      *Plaintiffs*,

v.


SHIREEN GANDHI, in her official capacity as Interim Commissioner of the MINNESOTA
      DEPARTMENT OF HUMAN SERVICES, and individually;
MARY KELSEY,
FRANCIS DAVENPORT,
JOHN DOE 1-10, and
JANE DOE 1-10, individually;

      *Defendants*.

---

## PLAINTIFFS' ORIGINAL COMPLAINT

---

Plaintiffs submit this Complaint against Defendants, based on personal knowledge and upon information and belief as follows:

## INTRODUCTION

1.      The State of Minnesota has created a licensing scheme for entities licensed by the Minnesota Department of Human Services (DHS) that is intentionally designed to permit DHS to impose licensing sanctions, including license revocation, while permitting license-holders only the illusion of due process. The process had allowed DHS to secretively identify targets for licensing

1

enforcement based on racial biases or personal vendettas of DHS officials, impose licensing sanctions based on minimal and intentionally biased investigations, prevent license-holders from effectively resisting imposition of licensing sanctions, conceal or misrepresent evidence, circumvent evidentiary rules to gain unfair advantages for DHS in administrative hearings, and ultimately simply overrule the determinations of administrative law judges (ALJs) while rendering subsequent judicial review illusory and meaningless.  Minnesota's system thus empowers DHS to strip license-holders of their procedural due process rights under the United States Constitution and to coerce license-holders to comply with the whims of DHS officials even when those whims have no basis in law.

2. Since 2021, DHS has deployed this rigged system of license sanctioning to engage in selective discriminatory prosecution against providers of adult foster care (AFC) and home- and community-based (HBCS) services who are members of African immigrant communities. This enforcement campaign was accomplished by investigation of targets specified by state DHS officials based on their perceived racial and/or ethnic ownership, with specific directives to obtain information that will justify the predetermined goal of license revocation and to avoid obtaining information that might provide the targeted license-holders with any defense.  These rigged investigations violated Plaintiffs' constitutional rights under the Due Process Clause of the United States Constitution.

3. DHS's rigged investigations resulted in revocation of numerous licenses and the corresponding loss of livelihood for the targeted providers, who often had substantial records of providing excellent care to their residents.  DHS's investigations were not only targeted against Plaintiffs due to their perceived racial and/or ethnic ownership, but the investigations also resulted in imposition of more severe sanctions those imposed on other license-holders with similar alleged

2

violations of AFC and HCBS licensing statutes and rules.  DHS' bias was also illustrated by its pattern of repeatedly and intentionally violating laws requiring that DHS consider the interests of the residents affected by license-revocations, thus violating the very same principles of community-based healthcare that DHS claimed to be honoring.  DHS's selective targeting of Plaintiffs for severe licensing sanctions violated Plaintiffs' constitutional rights under the Fourteenth Amendment.

4.     Over the course of its discriminatory and retaliatory enforcement campaigns, DHS's actions have taken a severe toll on the individuals targeted, their families, and their residents, including loss of present and future livelihoods and damage to mental health.  DHS's actions have also harmed the vulnerable adults it purported to serve, forcing vulnerable adults out of home settings where they were happy and well-cared-for in order to service the egos and prejudices of DHS employees.  Plaintiffs bring this action to hold DHS accountable for the widespread damage it has caused.

## PARTIES

1.     Plaintiffs Hawa ABDULLE and Ahmed AYBAKAR collectively, "Olmsted Plaintiffs") are current or former owners and operators of AFC facilities located in Olmsted County, Minnesota.

2.     Plaintiffs Kelvin CAGA, Bruce MIZERO, Victoria YEBOAH, and Kehinde Yusuf (collectively "Clay Plaintiffs") are former AFC license holders, formerly doing business in Clay County, Minnesota.

3.     Plaintiffs ABDULLE and AYBAKAR (collectively "Somali Plaintiffs") are of Somali descent.

3

4.    Plaintiffs CAGA, MIZERO, YEBOAH, and YUSUF (collectively, "West African Plaintiffs") are of West African descent.

5.    Somali Plaintiffs and West African Plaintiffs are collectively referred to as "African Plaintiffs."

6.    Defendant Shireen GANDHI is the Interim Commissioner of Human Services and is sued in her individual and official capacity.

7.    Defendant MINNESOTA DEPARTMENT OF HUMAN SERVICES(DHS) is a state agency in Minnesota with administrative and regulatory authority over AFC and HCBS license-holders.

8.    Defendant Mary KELSEY is an AFC licensing supervisor employed by DHS and is sued in her individual capacity.

9.    Defendant Francis DAVENPORT is an AFC licensor employed by Clay County Social Services, an agency of Clay County that regulates AFC facilities in Clay County under the supervision and control of DHS and is sued in her individual capacity.

10.    Defendants JOHN DOE 1-10 and JANE DOE 1-10 are unknown employees of DHS or county social-services agencies in Minnesota supervised by DHS under Minn. Stat. § 393.07, subd. 2.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction under 28 U.S.C. §§ 2201, 1331, 1343, 1367, and 1441(a) and under *Ex Parte Young*, 28 S. Ct. 441, 209 U.S. 123 (1908).

12.    Venue is proper in the District of Minnesota under 28 U.S.C. § 1391 because (1) Defendants all reside within the District of Minnesota and (2) because a substantial part of the events giving rise to Plaintiffs' causes of action occurred within the District of Minnesota.

**BACKGROUND**

*Minnesota's Statutory Scheme for AFC and HCBS Licensing Investigation and Sanctioning*

*Is Rigged Against License-Holders*

1.        Operators of AFC and/or HCBS programs must be licensed by DHS unless an exception applies. *See* Minn. Stat. § 245A.03, subds. 1, 2. AFC license-holders are subject to special requirements that the AFC residence must be their "primary residence" and that the license-holder must be the "primary caregiver." Minn. Stat. § 245A.02, subd. 6f. If DHS finds that an AFC license-holder failed to maintain the AFC residence as their primary residence, DHS is required by law to revoke all licenses issued under Chapter 245A, including both AFC and HCBS licenses. Minn. Stat. § 245A.03, subd. 7(a). Although license revocation for violation of the "primary caregiver" requirement is not required by statute, DHS has treated such revocation as mandatory when convenient for DHS to pursue its predetermined goal of revoking a targeted AFC license.

2.        DHS may also sanction or revoke an AFC license for any other violation of statute or rule, including the "primary caregiver" requirement, but DHS is supposed to consider the "nature, chronicity, and severity" of the violations as well as the well-being of the persons served by the license-holder's program before doing so. *See* Minn. Stat. §§ 245A.07, subd. 1; .04, subd. 6(a)(2). In practice, however, DHS's consideration of the nature, severity, and chronicity of violations and the interests of persons served by the program ranges from perfunctory to nonexistent. *See, e.g.*, *In re Surveillance and Integrity Review of Wright*, A21-1206, 2022 WL 1532115, at *3-4 (Minn. App. May 16, 2022) (holding that agency's "superficial" consideration of statutory factors was adequate to support its choice of sanction). These provisions thus provide

5

no meaningful barrier to DHS's choice to impose a severe sanction such as license revocation even for violations that caused no actual harm to any person.

3.        License-holders may appeal DHS's licensing sanctions but the appeals process is structurally skewed heavily in favor of DHS.  When a license is revoked, the license-holder may continue to operate pending the administrative portion of the appeal but a recent legislative change sought by DHS empowers DHS to impose "terms the license holder must follow pending a final order in the appeal."  *See* Minn. Stat. § 245A.07, subd. 1. Although the extent of the authority granted by this change is not specified, there is no opportunity for the license-holder to appeal these temporary conditions.

4.        When a license-holder appeals an AFC license-revocation, the resulting hearing is held under the so-called "revenue recapture rules" that severely limit the ability of the license-holder to conduct discovery.  *See* Minn. Stat. § 245A.08, subd. 1 (directing use of the revenue recapture rules); Minn. R. 1400.8600 (limiting required discovery to "the names and addresses of all witnesses that the other party intends to have testify at the hearing); Minn. R. 1400.8601, subpt. 1 (requiring parties seeking discovery by subpoena to first obtain permission from the administrative law judge and identify documents sought "with particularity").  This differs from the rules for contested case hearings, which allow parties to conduct any discovery permitted in civil cases.  *See* Minn. R. 1400.6700, subpt. 2. Under the revenue recapture rules, DHS can and does conceal exculpatory evidence from license-holders appealing a licensing sanction by simply declining to offer it at trial.

5.        Although county social-service agencies have primary investigative responsibility for AFCs in Minnesota, DHS has coopted that authority to control investigations of AFCs when it suits DHS's interests.  Under its authority to supervise county social-services agencies, *see* Minn.

Stat. §§ 245A.16, subd. 1(a); 393.07, subd. 2, DHS also specifically directs investigators to carefully limit their investigations to areas where it most expects to find some indication of a violation. Immediately upon discovery of any indication of any violation, the investigators are instructed to refrain from asking questions that might reveal an innocent explanation for the potential violation, to cease their investigation, and to immediately refer the matter to DHS with a "recommendation" for license revocation.

6.      DHS exercises also its authority over county social-service agencies to force those agencies to adopt a hostile stance towards targeted AFC operators. When DHS suspects that county social-services investigators might not be sufficiently aggressive and hostile towards the AFC operators that DHS is targeting, DHS replaces those agency investigators with investigators assigned directly from DHS state headquarters. Upon information and belief, DHS has also threatened county social-services investigators with adverse employment consequences if those county investigators fail to aggressively prosecute DHS's designated targets.

7.      Notwithstanding the severe limits on disclosures imposed by the revenue recapture rules, the Minnesota Attorney General's Office, which represents DHS in administrative hearings, has implemented a policy of disclosing the entirety of what DHS identifies as its investigative file to license-holders challenging licensing sanctions. But the AG's Office conducts no independent verification of what DHS claims to be its investigative file and defends DHS's refusals to respond to discovery attempts that exceed the draconian limits of the revenue recapture rules. DHS is thus able to defeat any attempts to discover how it targeted a particular license-holder, the specific reasons for the limits of its investigations, and any exculpatory information it might have withheld.

8.      The administrative hearings themselves are also skewed in favor of DHS. DHS is required only to show "reasonable cause" (which is equivalent to probable cause in a criminal

case) for its decision to sanction a license. *See* Minn. Stat. § 245A.08, subd. 3(a). DHS is also permitted to use hearsay evidence to carry this light burden without submitting the underlying witnesses for cross-examination. *See id.* (permitting DHS to carry its burden by submission of "statements, reports, or affidavits to substantiate the allegations that the license holder failed to comply fully with applicable law or rule"); *see also* Minn. R. 1400.8607, subpt. 1 (allowing use of hearsay at revenue recapture hearings). In practice, hearsay statements made or reported by DHS investigators enjoy a very strong presumption of credibility, instantly putting the license-holder at a disadvantage when DHS investigators claim that a witness—even an anonymous witness—has made an inculpatory statement. This presumption of credibility exists even when the purported hearsay statement is made by a vulnerable adult with serious mental illnesses or a documented history of dishonesty. *See, e.g.*, *Collins v. Comm'r of Minn. Dept. of Hum. Servs.*, 2023 WL 2566055, at *5 (Mar. 13, 2023) (assuming that statements of vulnerable adult were "reliable hearsay" and holding that an ALJ can make credibility determinations favoring a hearsay witness without a witness's appearance and without cross-examination).

9.      License-holders seeking to challenge the hearsay statements purportedly made by vulnerable adults are impaired by DHS's threat to characterize any attempt to call the vulnerable adult as a witness or to even interview the vulnerable adult at all as maltreatment, coercion, or intimidation. *See* Minn. Stat. § 626.5572, subd. 2 (defining "abuse" to include "coercing or enticing a vulnerable adult against the vulnerable adult's will to perform services for the advantage of another."). DHS thus has the power not only to intentionally limit its own investigation but also to put limits on license-holders' attempts to conduct their own investigations and to marshal evidence for their defense.

10.     After DHS meets the low "reasonable cause" threshold, the burden of proof shifts to the license-holder to prove by a preponderance of evidence that the license-holder was "in full compliance" with *all* applicable statutes and regulations at the time of the alleged violation. *See* Minn. Stat. § 245A.08, subd. 3(a). This extends DHS's advantage by forcing the license-holder to not only disprove each of DHS's allegations regarding aspects of the license-holder's program that DHS investigated but also to prove compliance with all aspects that DHS did not investigate but that its investigators might speculate about in reports and trial testimony.

11.     DHS also enjoys a presumption of expertise during administrative hearings. Even without prior notice of expert testimony, DHS's witnesses are permitted to give personal opinions about the legislative intent of AFC licensing statutes. Any contrary opinions expressed by license-holders are automatically deemed to reflect ignorance of AFC statutes, further justifying license-revocation.

12.     DHS also skews the administrative hearing process by intimidating material witnesses. Specifically, DHS has threatened and/or retaliated against county social workers who testified in favor of license-holders or that DHS perceives as too friendly to license-holders. Upon information and belief, DHS has also issued instructions to county social workers to refuse to testify in favor of license-holders unless subpoenaed and to comply with DHS instructions about the content of their testimony if subpoenaed.

13.     During administrative hearings, license-holders are not permitted to raise constitutional issues, including questions of selective discriminatory enforcement or lack of due process in DHS's investigative and decision-making processes. *See, e.g.*, *In re On-Sale Liquor License, Class B*, 763 N.W.2d 369, 371 (Minn. App. 2009) ("The law does not permit an ALJ to address constitutional issues because a constitutional challenge is a controversy that requires

9

judicial interpretation."). This lack of authority for ALJs effectively prevents license-holders from obtaining any judicial review of constitutional issues arising from licensing cases because Minnesota courts interpret the failure to raise constitutional issues to an ALJ that is not empowered to hear them as a waiver of the right to appeal based on those constitutional issues. *See id* (noting that appellate court will also refuse to address the issue of racial animus because of the lack of a record and because it is outside the scope of appellate review of an administrative hearing); *In re Yusuf*, A24-0430, 2024 WL 4814785, at *5 n.8 (Minn. App. Nov. 18, 2024) (noting that administrative law judge had refused to allow license-holder to put evidence of bias into the record but declining to review the appellant's constitutional claims because the appellant had not challenge the ALJ's evidentiary determination to the DHS Commissioner). This not only shields DHS's enforcement practices from both administrative and judicial scrutiny, it limits license-holders' ability to mount an effective defense by limiting their ability to impeach the credibility of DHS's witnesses with evidence of either individual racial animus or evidence of a pattern of discriminatory enforcement or disparate treatment by DHS.

14.  DHS is also able to block selective administrative enforcement claims by directly limiting the evidentiary record license-holders can create. Minnesota law requires that, in order to make an allegation of selective discriminatory enforcement, a license-holder must show that other similar violators were not subjected to the same discipline. *See, e.g.*, *State v. Russell*, 343 N.W.2d 36 (Minn. 1984). And license-holders seeking to raise this issue on judicial review must be able to create that record before the ALJ or else the Minnesota appellate courts will refuse to address it. *See, e.g.*, *In re On-Sale Liquor License, Class B*, 763 N.W.2d at 371 (noting that the lack of a factual record presented to the ALJ precluded the appellate court from reviewing a discriminatory enforcement claim). But DHS routinely and successfully opposes license-holders' efforts to create

10

such a record by persuading the ALJ that the behavior of other license-holders is not relevant to its basis for revoking the particular license at issue. In combination with the limits described above on discovery in administrative proceedings, DHS is thus able to shield its discriminatory conduct from efforts to obtain judicial review of its enforcement patterns. Simply put, no realistic path exists in Minnesota law to hold DHS accountable for selective discriminatory enforcement or any other constitutional violations in the course of an administrative appeal of a license-revocation.

15. At the conclusion of administrative hearings on an appeal from a DHS license-revocation order, the administrative law judge makes a recommendation to the DHS Commissioner whether the license-revocation should be rescinded, modified, or affirmed. *See* Minn. Stat. §§ 14.50; 14.62, subd. 2a. But the ALJ's findings are not binding and receive no deference from the Commissioner. *See In re Excess Surplus Status of Blue Cross and Blue Shield of Minn.*, 624 N.W.2d 264, 274 (Minn. 2001) (holding that agency commissioner "was not required to treat the ALJ's recommendation with the same deference an appellate court must accord the findings of a trial court, as the ALJ's report is only one part of the record"). Instead, the Commissioner is empowered to accept, modify, or reject the ALJs recommendations. *See* Minn. Stat. § 14.62, subd. 2a (mandating that the ALJ report only becomes final if the agency fails to modify or reject it within 90 days). In exercising that authority, the Commissioner is empowered to modify or reject any or all of the ALJ's findings, including the ALJ's credibility findings, provided only that the Commissioner articulates some basis in the record for the modifications. *See Mammenga v. State Dep't of Hum. Servs.*, 442 N.W.2d 786, 789 (Minn. 1989) (noting that Minnesota appellate courts will defer to an agency commissioner's modification or rejection of an ALJ's findings unless a license-holder can demonstrate that the commissioner's decision is "based on whim or is devoid of articulated reasons"). Thus, even when license-holders overcome the daunting barriers arrayed

11

against them in the administrative hearing process itself, their hard-won victory will almost always be abruptly cancelled by the Commissioner based on whatever cherry-picking and reweighing of the evidence suits DHS's interests. *See, e.g.*, *In re Revocation of Fam. Child Care License of Beckman*, No. C8-03-315, 2003 WL 22332788, at *3 (Minn. App. Oct. 14, 2003) (affirming DHS Commissioner's rejection of ALJ's credibility determinations based on Commissioner's reweighing of other evidence in the record).

16.     In practice, the DHS Commissioner has routinely deployed this power to remove or alter any findings that are contrary to DHS's predetermined goals of justifying license-revocation and of avoiding revelations that might call into question the propriety of DHS's actions.

17.     Although license-holders and DHS are both permitted to present exceptions to the ALJ's report and to respond to each other's exceptions, *see* Minn. Stat. § 14.61, subd. 1, license-holders intrinsically sit at a position of disadvantage compared to DHS in this process because the adjudicative official—the Commissioner—is also the politically appointed leader of a party to the proceeding, with a strong institutional interest in ratifying her subordinates' actions.

18.     Minnesota's statutory scheme also contains no provision to prohibit, prevent, or disclose *ex parte* communications or other attempts to influence the Commissioner's ultimate decision. *Cf.* Minn. R. 1400.7700 (limiting ALJs' *ex parte* contacts but imposing no similar rule on agency commissioners deciding whether to overrule an ALJ's report). License-holders are also not permitted any mechanism to discover whether the Commissioner has engaged in *ex parte* communications with other DHS employees prior to making a decision on whether to modify or reject ALJ recommendations. Minnesota's licensing process thus fails to incorporate the *only* mechanism that serves to ensure that the ultimate decisionmaker remains true to the judicial assumption that she is unbiased because license-holders are given no ability to effectively argue

12

that the Commissioner had predecided issues, was biased, or was improperly influenced. *Cf. Urb. Council on Mobility v. Minnesota Dep't of Nat. Res.*, 289 N.W.2d 729, 736 (Minn. 1980) (noting that presumption that agency head could remain unbiased was tested by the appellant's ability to "inquire of the commissioner, by way of interrogatories, regarding the decision-making process"); *No Power Line, Inc. v. Minn. Envtl. Quality Council,* 262 N.W.2d 312, 325 (Minn.1977) ("There is a presumption of administrative regularity, and the party claiming otherwise has the burden of proving a decision was improperly reached"). *Compare* 5 U.S.C. § 557(d)(1) (prohibiting *ex parte* communications made or caused by or with persons involved in administrative decision-making).

19.     After the DHS Commissioner decides to revoke a license, either by affirming or rejecting the ALJ's recommendation, DHS is empowered to act immediately to terminate the license-holder's program, relocate residents, and cut off all reimbursements from state-managed health care programs.  Thus, DHS can, on its own judgment or whim, put license-holders out-of-business and strip them of resources before judicial review can even be attempted, even in cases where DHS has conceded that there has been no harm to residents pending appeal.  Although Minnesota law contains a provision allowing DHS to stay its final license-revocation orders pending appeal, it imposes no limit on DHS's discretion and DHS routinely and automatically denies such requests.

20.     Judicial review of the Commissioner's decisions is sharply circumscribed, requiring the Commissioner to only articulate some basis for the Commissioner's ultimate decision to revoke a license. *Mammenga v. State Dep't of Hum. Servs.*, 442 N.W.2d 786, 789 (Minn. 1989) (noting that Minnesota appellate courts will defer to an agency commissioner's modification or rejection of an ALJ's findings unless a license-holder can demonstrate that the commissioner's decision is "based on whim or is devoid of articulated reasons").  The Commissioner is thus free

13

to cherry-pick the record and selectively weigh evidence to support a predetermined outcome without risking appellate reversal. *See, e.g.*, *Whitehead v. Moonlight Nursing Care, Inc.*, 529 N.W.2d 350, 352 (Minn. Ct. App. 1995) ("This Court . . . will not disturb the findings of the Commissioner's representative if the record contains evidence that reasonably tends to sustain them."); *Vargas v. Nw. Area Found.*, 673 N.W.2d 200, 205 (Minn. App. 2004), *review denied* (Minn. Mar. 30, 2004) ("When parties have presented conflicting evidence on the record, appellate courts must defer to [a] commissioner's ability to weigh the evidence; they may not weigh that evidence on review."); *see also* Minn. Stat. § 14.69 (requiring only that the Commissioner's determinations be supported by "substantial evidence in view of the entire record as submitted").

21.     In summary, Minnesota's statutory scheme for licensing investigations and sanctions—as interpreted and applied by Minnesota courts—empowers DHS to selectively target license-holders for investigation, rig the resulting investigation to reach a predetermined outcome of revoking a license, conceal evidence from license-holders trying to defend their livelihoods, misrepresent evidence that is disclosed, impair the targeted license-holders' ability to discover exculpatory evidence on their own, prevent license-holders from raising issues of agency misconduct, force license-holders to submit their appeals to a decisionmaker that is not likely to be neutral, prevent license-holders from discovering or arguing actual bias on the part of the decisionmaker, impose immediate loss of livelihood *before* obtaining judicial review, and enfeeble judicial review.

22.     The structural bias against license-holders in Minnesota's licensing-sanctioning system is evident in its results.  Only a tiny proportion of license-holders manage to obtain a favorable recommendation from the ALJ.  Those that do prevail in the ALJ's report find that hard-won victory reversed by the DHS Commissioner on precisely the same grounds DHS seeks in its

14

exceptions, justifying the inference that either pre-existing bias or *ex parte* communication influences the final decision.

23.     It also illustrative that there are no known cases where the ALJ recommends affirming a license revocation but the Commissioner overrules the ALJ on the basis of a license-holders' exceptions.  In fact, Commissioner's final orders affirming an ALJ recommendation to revoke a license rarely even mention the license-holder's exceptions at all, justifying the inference that the Commissioner does not substantively consider license-holders' exceptions at all.

*DHS Exploits Ambiguities and Structural Biases in Minnesota's Statutory Scheme for Adult Foster Care (AFC) and Home- and Community-Based Services (HCBS) Licensing to Render License-Holders Vulnerable to Loss of their Licenses Based on DHS's Whim*

24.     To qualify for AFC licenses in Minnesota, the licensed residence must be the "primary residence" of the license-holder(s) and the license-holder(s) within each residence must be the "primary caregiver[s]."  *See* Minn. Stat. § 245A.02, subd. 6f.  Chapter 245A of Minnesota Statutes does not, however, provide definitions of either of these terms.

25.     The requirement that the licensed residence be the primary residence of the license-holder(s) is the main characteristic distinguishing AFC programs from "community residential settings," which are colloquially referred to as "corporate homes" because they are often owned and/or operated by larger corporate entities.

26.     AFC license-holders that are found in violation of the "primary residence" requirement face mandatory revocation of their AFC license and a five-year prohibition on reapplication for licensure.  *See* Minn. Stat. § 245A.03, subd. 7(a).

27.     Many AFC operators also provide home- and community-based services (HCBS) within their homes.  Such services are licensed under Chapter 245D of Minnesota Statutes.  AFC

15

operators can offer such services within their AFC homes either by obtaining their own HCBS license or by providing HCBS services as a "host home" location under the supervision of another person who holds an HCBS license. *See* Licensing for Home and community-Based Services— 245D Providers, https://mn.gov/dhs/partners-and-providers/licensing/hcbs-245d/, dated Feb. 1, 2025, accessed Feb. 17, 2025 (noting that AFC providers can provide HCBS services when "a different 245D licensed provider comes into the foster care home to provide the 245D service").

28. Many rights and privileges of AFC/HCBS recipients are protected by statute, including the rights to refuse services, to a safe and clean environment, to courteous and respectful treatment, to personal privacy, to have access to "common areas," and to "engage in chosen activities." *See* Minn. Stat. §§ 245A.11; 245D.04, subd. 3. Neither the term "chosen activities" nor the term "common areas" is defined by statute.

29. DHS has promulgated administrative rules for AFC homes, but these rules have not been updated since first implemented more than 30 years ago. The AFC rules do not define the terms "primary residence," "primary caregiver," "common areas," or "chosen activities." AFC rules do require, however, that the AFC residence "meet the definition of a dwelling unit in residential occupancy" and that AFC residents have access to "the living room" and "a dining area furnished for group eating that is simultaneously accessible to [AFC] residents and household members." *See* Minn. R. 9555.6205, subpts. 1-3.

30. The HCBS rules also define none of these terms except "primary caregiver," which is defined to mean a person other than a member of the person's family who has primary responsibility for the assistance, supervision, or training of the person in the person's residence." *See* Minn. R. 9525.1800, subpt. 20.

16

31.     Notwithstanding the lack of statutory or regulatory definitions for the "primary residence" requirement, DHS secretly instructed its state and county AFC licensing investigators in 2021 to look for violations from a list of 12 criteria to justify a recommendation for license-revocation.  These criteria were never promulgated as rules but some of the criteria, including restrictions on the family structures of AFC license-holders, were announced to AFC license-holders by a statewide letter to all AFC license-holders on February 7, 2023.  This letter was personally authored by Defendant Mary KELSEY, who subsequently testified in subsequent license-revocation proceedings that violations of the "expectations" stated in the letter was sufficient to justify revocation of AFC licenses, even where there were no allegations of maltreatment.

32.     KELSEY's letter also announced DHS's interpretation of the "primary caregiver" requirement.  KELSEY's definition ignored the definition of the same term for HCBS license-holders and that required an AFC license-holder personally provide "a majority" of all services that are provided in the home.  Subsequent court testimony by KELSEY clarified that the "majority" requirement would be measured based on a comparison between the total number of hours worked by the license-holder and the combined total number of hours in the residents' service plans.  KELSEY's letter made clear that even care provided by family members, like that which would be provided in a family that has a special-needs child in a non-foster environment, would be counted against the license-holder when DHS investigated the "primary caregiver" requirement.

33.     Although HCBS services are separately licensed, an AFC license-holder's ability to provide HCBS services is dependent on their ability to maintain an AFC license because Minnesota law provides that revocation of an AFC license requires automatic revocation of an

17

HCBS license. *See* Minn. Stat. § 245A.04, subd. 7(d) ("When a license issued under this chapter or chapter 142B is revoked, the license holder and each affiliated controlling individual with a revoked license may not hold any license under chapter 245A for five years following the revocation, and other licenses held by the applicant or license holder or licenses affiliated with each controlling individual shall also be revoked.").

34.    In combination, DHS's use of unpromulgated interpretive rules, intentionally skewed investigations, and the rigged licensing appeals process allows DHS to identify, target, investigate, and revoke licenses entirely at DHS's whim.

### *DHS Has Exploited Minnesota's Rigged System for AFC and HCBS Licensure to Selectively Target African AFC Providers for More Severe Licensing Sanctions than Other Providers*

35.    Exploiting the structures and processes set forth above, DHS from 2021 to at least 2024 undertook an aggressive enforcement campaign focused primarily on two Minnesota counties: Clay County in northwestern Minnesota and Olmsted County in southeastern Minnesota. Notwithstanding DHS's purported policy of relying on local investigators to monitor AFC operations and determine any needs for investigations, the enforcement campaigns in Clay County and Olmsted County were initiated, directed, and controlled by DHS. "Recommendations" by county licensing officials for license revocation were a sham, as DHS directly specified the targets, limited the scope of the investigations, and predetermined the outcomes of both the investigations and any subsequent administrative appeals.

36.    On information and belief, the enforcement campaign was designed from the outset by Defendants KELSEY, JOHN DOE 1-10, and JANE DOE 1-10 to target AFC providers of African descent because these Defendants held stereotypes that African-immigrant AFC providers

18

prioritized making money and were prone to cultural practices that did not produce the kind of "family" environment that these Defendants preferred to see.

37.     DHS's AFC licensing enforcement patterns from 2022 through 2024 display a stark pattern of discrimination, with 100% of the AFC license-revocation orders in Olmsted County from 2022 to 2024 targeting Somali providers and 100% of the license-revocation orders in Clay County targeting West African providers. Further, DHS's chosen sanction of immediate license revocation to these providers stood in contrast to lesser programs of "progressive sanctions" directed towards AFC/HCBS providers that are not Somali or West African.

38.     DHS selected Clay County for one of its initial enforcement campaigns in early 2022 because Clay County had a new AFC licensor, Defendant Frances DAVENPORT, who was particularly interested in differentiating herself from the collaborative approach taken by Clay County's previous AFC licensor and because DAVENPORT shared KELSEY's prejudices about African providers.

39.     DHS began by sending one or more lists of AFC/HCBS facilities in Clay County that it wanted investigated to DAVENPORT. Based on how the investigations were conducted, the directives from DHS likely stated that DAVENPORT should find any possible basis for violations that could support revocations of the targeted facilities' licenses.

40.     Upon information and belief, all of the targeted AFC/HSBC facilities in Clay County were owned by license-holders of West African descent.

41.     Each of the Clay Plaintiffs was on the list of targets identified by DHS in Clay County. The bases for the investigations included allegations that were entirely pretextual, including an allegation that one West African AFC provider—CAGA—had another AFC in North Dakota. The pretextual nature of such allegations was revealed by the fact that DHS's assigned

investigators, despite their aggressiveness in seeking any evidence of non-residence, did nothing to investigate the supposed initial allegation that CAGA had another AFC in North Dakota.

42.     During her investigations, DAVENPORT expressed bias against providers of African descent, including questioning why AFC/HCBS providers of African descent were even granted licenses in the first place when "they can't even speak English."  DAVENPORT also frequently displayed an attitude of hostility, condescension, and contempt for providers of African descent during drop-in visits and other personal licensing contacts with them.

43.     In constant coordination and collaboration with DHS, DAVENPORT conducted selective investigations against the targeted AFC/HCBS facilities, including all Clay Plaintiffs, immediately terminating each investigation as soon as any evidence that could be used to infer non-residency was found.  DAVENPORT and those acting under her direction consistently drew any possible inference in favor of non-residency and actively avoided lines of investigation that might reveal evidence of residency.

44.     Upon information and belief, DHS also instructed DAVENPORT that, if she was unable to find evidence of noncompliance with DHS's "primary residence" definition, she should seek evidence of any alternative justifications for a license-revocation recommendation, including violations of the "primary caregiver" requirement and other violations of AFC/HCBS statutes, rules, and DHS's interpretions.

45.     DHS's enforcement campaign in Clay County from 2022 to 2024 resulted in license-revocation orders against eight AFC/HBCS providers, including all Clay Plaintiffs.   Of the six license-revocations that were administratively appealed, the DHS Commissioner affirmed the order of license revocation in every single case, including one case—CAGA—where the Commissioner overrode the recommendation of the assigned ALJ.

20

46.     At least two of the Clay Plaintiffs—YUSUF and CAGA—sought to introduce evidence of selective discriminatory enforcement by DHS.  Citing the incapacity of ALJs to decide constitutional issues under Minnesota law, however, DHS successfully persuaded both ALJ's to prohibit the license-holders from introducing such evidence.  On appeal, the Minnesota appellate courts held that YUSUF and CAGA's inability to introduce such evidence to the ALJ prevented them from raising it as an issue on appeal.

47.     In the CAGA case, after CAGA overcame the daunting structural disadvantages for license-holders imposed by Minnesota's administrative appeals process, the ALJ found that DHS had failed to comply with its statutory obligations to consider the severity of CAGA's violation of the "primary caregiver" requirement and to consider the expressed preferences of the residents in CAGA's program before choosing to revoke his license.  Based on these failures and the testimony of a resident in favor of CAGA, the ALJ recommended that DHS impose a conditional license instead of revoking CAGA's license.

48.     GANDHI rejected the ALJ's recommendation, finding that KELSEY's expression of her personal opinions about the general interests of persons in AFC settings was sufficient.  On information and belief, GANDHI's determination was predetermined as part of a policy decision to target Clay Plaintiffs for license-revocation.  Simply put, GANDHI was not a neutral decisionmaker in the CAGA case or other AFC license-revocation cases because these license-revocation cases were part of an institutional policy decision to target AFC providers for license revocation, beginning with license-holders of African descent.

49.     Building on its successful campaign to target African AFC providers in Clay County, DHS implemented a campaign targeted on African AFC providers in Olmsted County starting in early 2023.

50.     DHS used a similar method to that it used in Clay County, determining the targets for investigation at state DHS headquarters.  Each of the Olmsted Plaintiffs was on DHS's list of targets for investigation and, on information and belief, all of the targets identified on DHS's target list were AFC/HCBS license-holders of Somali descent.

51.     In contrast to the situation in Clay County, DHS did not initially have a local licensor that shared its animus towards African AFC providers.  Instead, the local licensor had a good relationship with Olmsted County's community of AFC providers and there was no indication that Olmsted County's licensor shared DHS's prejudices against African providers.  Accordingly, DHS did not rely on local Olmsted County licensors to conduct its investigations and instead dispatched investigators directly from state DHS headquarters to conduct (in the words of one DHS investigator) a "sweep." On information and belief, the reason that DHS used state investigators instead of local investigators was to ensure that the investigators would provide the predetermined outcome of a license-revocation recommendation.

52.     The inference that the outcome of the investigations was predetermined is justified by the pattern shown in the investigators' actions.  As in Clay County, the investigations were focused exclusively on gathering indications of non-residence and the investigators were instructed to immediately stop asking questions once they had successfully obtained some pretense upon which to base a recommendation to revoke the targeted providers' licenses.

53.     A clear example of the investigators' sham investigations in Olmsted County can be seen in the ABDULLE case.  In ABDULLE's case, the investigators relied initially on an ambiguous statement by the license-holder's son referring to a house across the street as the "family home."  Upon hearing the reference, the investigators intentionally avoided asking the son to clarify and instead adopted the presumption that the comment meant that ABDULLE lived

22

across the street instead of at the AFC residence. Although ABDULLE was present and participating in the investigation, the investigators carefully avoided asking ABDULLE herself where she resided and also avoided asking any of the residents of the home where she resided. The investigators also avoided visiting the other residence to determine if there was any evidence that ABDULLE lived there. Instead, investigators recommended license-revocation based solely on the ambiguous statement of her son and later conducted targeted supplemental inquiries into the address on ABDULLE's driver's license and her homestead registration to buttress their predetermined conclusion.

54.     After ABDULLE successfully persuaded the ALJ that she did in fact reside at the AFC residence by presenting unrefuted testimony from eyewitnesses, including the local county licensor, that she was always found to be present at the AFC residence, GANDHI overrode the ALJ's recommendation, finding that ABDULLE's driver's license and homestead declaration— both factors that were used without prior notice to ABDULLE that they would be used as indicia of her primary residency—were more weighty evidence.

55.     The ALJ in ABDULLE also found that DHS had imposed a harsher sanction on ABDULLE than DHS had applied in similar cases non involving a Somali license-holder. GANDHI, however, removed the ALJ's finding from the final DHS order without explanation. Upon information and belief, GANDHI's purpose in removing the finding was to cover-up the fact known within DHS that African AFC providers were being selectively targeted.

56.     DHS's bias against Plaintiffs can also be seen in its contradictory use of its own identified indicia of residency across cases. For example, in the YUSUF and YEBOAH cases, DHS's decision to revoke the licenses was based on its determination that the license-holder did not reside primarily at the AFC address based on evidence of the license-holder's actual presence

23

at a different address, rejecting evidence of residency preferred by the license-holder, including driver's license address.  But in the ABDULLE case, DHS rejected all evidence of the license-holder's actual presence at the AFC in favor of the "documentary evidence" of the driver's license and homestead declaration.

57.    In the aftermath of the ABDULLE case, DHS also took action to further skew administrative appeals against AFC license-holders.  Specifically, DHS reacted to the fact that the local licensor had testified in support of ABDULLE's appeal by threatening the licensor with disciplinary action and, on information and belief, by informally promulgating a policy statewide that prohibited county licensors and case managers from testifying in support of targeted license-holders without DHS's express prior permission.

## CLAIMS FOR RELIEF

## COUNT ONE: SELECTIVE DISCRIMINATORY ENFORCEMENT (BY ALL PLAINTIFFS AGAINST INDIVIDUAL DEFENDANTS)

1.    Plaintiffs reassert the allegations in the paragraphs above as if fully set forth here.

2.    DHS's identification of Plaintiffs for investigation and license-revocation was part of a stark pattern of discrimination, revealed by the fact that 100% of the license-revocation actions against AFC/HCBS license-holders for non-maltreatment-related licensing actions from 2022 through 2024 were taken against Somali or West African license-holders.  DHS's actions thus constituted selective discriminatory enforcement, in violation of Plaintiffs' constitutional rights under the Equal Protection Clause of the United States Constitution.

3.    GANDHI, as commissioner of DHS has individual liability because GANDHI was personally responsible for setting institutional policy and because GANDHI personally made the final determinations in DHS's license-revocation actions.

24

4.     GANDHI also has individual liability for acts taken by the other Individual Defendants because GANDHI showed deliberate indifference that permitted the other Individual Defendants' acts to continue unchecked.

5.     GANDHI also has individual liability for acts taken by the other Individual Defendants because GANDHI had a duty to train the other Individual Defendants and failed to carry out that duty.

6.     KELSEY has individual liability because KELSEY was personally involved in selecting targets for investigation on discriminatory grounds and in carrying out the campaign of selective discriminatory enforcement.

7.     DAVENPORT has individual liability because DAVENPORT was personally involved in carrying out the campaign of selective discriminatory campaign in Clay County.

8.     Doe Defendants have individual liability because they personally participated in selecting targets for investigation on discriminatory grounds and/or in carrying out the campaign of selective discriminatory enforcement.

9.     Individual Defendants acted under color of state law, rendering their conduct actionable under 42 U.S.C. § 1983.

10.    Individual Defendants' selective targeting of Plaintiffs for investigations and/or license-revocations due to their racial and/or ethnic identity resulted in financial losses to Plaintiffs, including the losses of their businesses.  Plaintiffs are therefore entitled to an award of compensatory damages in the amount of those losses and in an exact amount to be proven at trial.

11.    Plaintiffs also suffered extreme mental anguish and harm as a result of Individual Defendants' willing and intentional participation in a program of racial and/or ethnic discrimination that substantially added to a broader environment of extreme fear among members

25

of Minnesota's Somali community, justifying an additional award of damages in an amount two times the amount of Plaintiffs economic damages and in an exact amount to be proven at trial.

12.     Plaintiffs are also entitled to an award of attorney's fees under 42 U.S.C. § 1988(b).

**COUNT TWO: DENIAL OF PROCEDURAL DUE PROCESS (INVESTIGATION) (AS-APPLIED) (BY ALL PLAINTIFFS AGAINST INDIVIDUAL DEFENDANTS)**

13.     Plaintiffs repeat the allegations in paragraphs above as if fully set forth herein.

14.     Plaintiffs have a protected due-process right to a reasonable investigation, including reasonable inquiry into readily available exculpatory information.

15.     By intentionally structuring investigations to reach a predetermined outcome and to avoid inquiry into readily available indications of residency that would be exculpatory towards Plaintiffs, Individual Defendants violated each Plaintiff's rights to a reasonable investigation.

16.     GANDHI has individual liability for acts taken by the other Individual Defendants because GANDHI showed deliberate indifference that permitted the other Individual Defendants' acts to continue unchecked.

17.     GANDHI also has individual liability for acts taken by the other Individual Defendants because GANDHI had a duty to train the other Individual Defendants and failed to carry out that duty.

18.     KELSEY has individual liability because KELSEY was personally involved in establishing and applying the investigative policies intended to ensure that the investigations reached the predetermined outcome of license-revocation.

19.     DAVENPORT has individual liability because DAVENPORT was personally involved in carrying out the investigative techniques intended to ensure that the investigations reached the predetermined outcome of license-revocation.

26

20.     Individual Defendants acted under color of state law, rendering their conduct actionable under 42 U.S.C. § 1983.

21.     Individual Defendants' denial of Plaintiffs' due-process rights by sham investigations resulted in financial losses to Plaintiffs, including the losses of their businesses. Plaintiffs are therefore entitled to an award of damages in the amount of those losses and in an exact amount to be proven at trial.

22.     Plaintiffs also suffered extreme mental anguish and harm as a result of Individual Defendants' willing and intentional participation in sham investigations, justifying an additional award of damages in an amount two times the amount of Plaintiffs economic damages and in an exact amount to be proven at trial.

23.     Plaintiffs are also entitled to an award of attorney's fees under 42 U.S.C. § 1988(b).

**COUNT THREE: DENIAL OF PROCEDURAL DUE PROCESS (RIGGED APPEAL PROCESS) (AS-APPLIED) (BY ALL PLAINTIFFS AGAINST OFFICIAL-CAPACITY DEFENDANTS ONLY)**

24.     Plaintiffs repeat the allegations in paragraphs above as if fully set forth herein.

25.     Minnesota's system of administrative appeals for AFC/HCBS license-holders denies procedural due-process in multiple ways, including (1) using criteria for determining residency that were not disclosed or reasonable foreseeable to license-holders; (2) failing to ensure a sufficient investigation that includes reasonable inquiry into readily available exculpatory information; (3) failing to provide a fair forum for adjudication of license-holders' appeals; (4) failing to protect against *ex parte* communications between DHS licensing officials and the DHS Commissioner making the final determination of whether to revoke a license; (5) failing to ensure that the DHS Commissioner is and remains a neutral decision-maker; and (6) allowing the DHS commissioner to enforce a final decision prior to any opportunity for judicial review.

26.  Plaintiffs are therefore entitled to declaratory judgment that Minnesota's administrative appeals process for AFC/HCBS license holders violates constitutional due process and a permanent injunction requiring (1) that DHS cease using investigative procedures that avoid reasonable inquiry into readily available exculpatory information; (2) that DHS disclose its criteria for determining residency to license-holders before applying those criteria in licensing investigations; (3) that DHS use neutral procedures to ensure a fair administrative appeals process, including permitting full discovery of relevant information; (4) that DHS refrain from requesting that license-holders be prevented from creating a record of potential discriminatory enforcement during administrative appeals; (5) that DHS implement verifiable procedures to prevent *ex parte* communications between the commissioner and DHS licensing officials regarding pending administrative appeals; and (6) that DHS implement procedures requiring a stay of license-revocation decisions pending judicial review unless there is a finding of maltreatment.

27.  Plaintiffs are also entitled to an award of attorney's fees under 42 U.S.C. § 1988(b).

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court award Plaintiffs:

(1)  Compensatory, consequential, special, exemplary, and punitive damages in an exact amount to be proven at trial;

(2) Declaratory judgment and temporary and permanent injunctive relief;

(3)  Reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

(4)  Costs and disbursements incurred in this action;

(5)  Prejudgment and postjudgment interest at the highest lawful rates; and

(6) Such further relief as Plaintiffs may be entitled and which the Court deems just and proper.

Dated:____06/25/2026_____          _____/s/ Jason Steck_____
                                       Jason Steck #0393077
                                       Attorney for Plaintiffs
                                       6160 Summit Drive North, Suite 220
                                       Brooklyn Center, MN
                                       jason@jasonstecklaw.com
                                       (763) 402-1829